IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION



UNITED STATES OF AMERICA

v.                                                                    CRIMINAL NO. 3:25-CR-1-HTW-LGI

STEPHANIE FAY PHELAN, D.P.M.                     18 U.S.C. § 1349

**The United States Attorney Charges:**

At all times relevant to this Information:

### GENERAL ALLEGATIONS

#### The Medicare Program

1. Medicare was a federally funded health insurance program that provided health benefits to individuals who were 65 years of age or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS").

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

4. Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part A covered hospital inpatient care; Medicare Part B covered physicians' services and outpatient care; Medicare Part C covered Medicare Advantage Plans; and Medicare Part D covered prescription drugs.

5. Physicians, clinics, and other health care providers, including laboratories (collectively, "providers"), that provided services to beneficiaries could enroll with Medicare and provide medical services to beneficiaries. Medicare providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

6. When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual. Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number; (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier. Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

### Medicare Part B

7. Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for benefits, items, or services rendered to beneficiaries.

8. Novitas Solutions Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions JH and JL, which included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania.

9. To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

10. In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

11. Payments under Medicare Part B were often made directly to the providers rather than to the beneficiaries. For this to occur, beneficiaries would assign the right of payment to providers. Once such an assignment took place, providers would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Molecular Diagnostic Testing

12. Molecular diagnostic tests were laboratory tests that used polymerase chain reaction testing and metagenomics to extract DNA from fungi to determine whether different types of bacteria were present in the specimen provided.

13. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed

body member." 42 U.S.C. § 13957(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

14. To conduct molecular diagnostic testing, a laboratory had to obtain a biological specimen from the beneficiary. One way to obtain a biological specimen was to obtain nail clippings from a beneficiary. The biological specimen was then submitted to the diagnostic laboratory to conduct testing.

15. Biological specimens were submitted along with requisitions, or doctors' orders, that identified the beneficiary, the insurance plan, and indicated the specific tests to be performed. In order for laboratories to submit claims to Medicare for molecular diagnostic tests, the requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the test.

### Relevant Individuals and Entities

16. **STEPHANIE FAY PHELAN, D.P.M. ("PHELAN")**, of Madison County, Mississippi, was a doctor of podiatric medicine licensed in the State of Mississippi who had the authority to order molecular diagnostic testing.

17. Laboratory 1, formed in 2011 and located in Tift County, Georgia was an independent diagnostic laboratory.

18. Sales Representative 1, of Madison County, Mississippi, solicited and recruited providers to refer doctors' orders and biological specimens to various diagnostic laboratories, including Laboratory 1.

19. Sales Representative 2, of Hinds County, Mississippi, solicited and recruited providers to refer doctors' orders and biological specimens to various diagnostic laboratories, including Laboratory 1.

## COUNT 1

### The Conspiracy and Its Object

20. Paragraphs 1 through 19 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

21. Beginning in or around November 2019, and continuing through in or around October 2021, in Madison County, in the Northern Division of the Southern District of Mississippi, and elsewhere, the defendant,

**STEPHANIE FAY PHELAN, D.P.M.,**

did knowingly and willfully, that is with the intent to further the object of the conspiracy, conspire and agree with Sales Representative 1, Sales Representative 2, and others known and unknown to the United States Attorney, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of material false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Medicare, in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

22. It was a purpose of the conspiracy for **PHELAN** and her co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting and receiving kickbacks and bribes in exchange for ordering and arranging for the ordering of molecular diagnostic testing to

be completed by Laboratory 1 and other laboratories; (b) ordering medically unnecessary molecular diagnostic testing to be performed on biological specimens of beneficiaries; (c) causing the submission of false and fraudulent claims to Medicare; (d) concealing and causing the concealment of false and fraudulent claims to Medicare; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means

23. The manner and means by which **PHELAN** and her co-conspirators sought to accomplish the objects and purpose of the scheme and artifice included, among other things:

    a. Sales Representative 1 and Sales Representative 2 sought out and formed relationships with diagnostic laboratories whereby the laboratories would pay them a share of the reimbursements received for testing of biological specimens that they referred.

    b. Sales Representative 1 offered to pay illegal kickbacks and bribes to **PHELAN** for referring doctors' orders and biological specimens to Laboratory 1.

    c. **PHELAN** agreed to send doctors' orders and biological specimens to Laboratory 1 in exchange for illegal kickbacks and bribes in the form of a share of the reimbursements received by Laboratory 1 for molecular diagnostic testing performed on the biological specimens.

    d. **PHELAN** took toenail clippings from beneficiaries and others and sent the toenail clippings to Laboratory 1, regardless of whether the molecular diagnostic testing of toenail clippings was medically reasonable or necessary for the treatment of the individual patients.

    e. Specifically, **PHELAN** contracted with various nursing homes and assisted living facilities, where **PHELAN** provided toenail care, including clipping and filing of toenails,

for beneficiaries, but did not provide any other podiatric or other care for these beneficiaries, such as evaluating their feet for the presence of bacteria or fungi.

      f.      At the nursing homes and assisted living facilities, **PHELAN** obtained biological specimens from large numbers of beneficiaries regardless of whether the individuals needed molecular diagnostic testing. **PHELAN** then ordered excessive testing of beneficiaries' toenail samples from Laboratory 1.

      g.      **PHELAN** ordered the laboratory testing, but did not use it to inform her treatment of the beneficiaries, nor did she review the results of the laboratory testing with the beneficiaries. In fact, many of the beneficiaries were unaware that laboratory testing was being performed on their toenail samples, or of the purpose or nature of the testing.

      h.      Despite knowing that remuneration could not be paid or received for referring biological specimens to Laboratory 1 for beneficiaries, nevertheless, **PHELAN** solicited and received illegal remuneration, namely kickbacks and bribes, from Sales Representative 1 and Sales Representative 2 in exchange for **PHELAN**'s referring biological specimens of beneficiaries to Laboratory 1.

      i.      From in or around February 2020 through in or around January 2021, Sales Representative 1 and/or Sales Representative 2 paid approximately $20,150.00 in illegal kickbacks to **PHELAN**, consisting of checks made out to a limited liability company owned and controlled by **PHELAN**, for the referral of orders for molecular diagnostic testing.

      j.      Laboratory 1 submitted electronic claims to Medicare, seeking reimbursement for the molecular diagnostic testing performed.

      k.      From in or around November 2019 through in or around October 2021, **PHELAN** caused Laboratory 1 to submit approximately $1,430,721.26 in false and fraudulent

claims to Medicare that were procured by the payment of illegal kickbacks and bribes, medically unnecessary, and ineligible for reimbursement. Laboratory 1 was reimbursed approximately $544,822.68 for molecular diagnostic testing of biological specimens submitted by or on behalf of **PHELAN**.

All in violation of Title 18, United States Code, Section 1349.

## **FORFEITURE ALLEGATIONS**

24. Upon conviction of the offense set forth above, the defendant, **STEPHANIE FAY PHELAN, D.P.M.**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

25. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    b.    has been placed beyond the jurisdiction of the Court;

    c.    has been substantially diminished in value; or

    d.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

_____
TODD W. GEE
United States Attorney

GLENN S. LEON
Chief, Fraud Section
United States Department of Justice